Philip Widener, on behalf of Bongo II, that is the Northern Lights Hotel. My associate, Mr. Hahn. May it please the Court. All parties assembled. This case is here on an appeal from a summary judgment grant. The standard of view is de novo. The evidence is to be viewed in the light most favorable to the non-moving party, that is, Bongo. This Court and the trial court cannot and should not weigh the evidence or the credibility of the issue. If there is any dispute as to material facts, and there are numerous disputes as to material facts in this case, summary judgment is not appropriate. Equity abhors a foreclosure. This case involves the abuse of the privilege of a non-judicial foreclosure that is avoiding the courts to resolve certain issues as to an exceptionally valuable piece of property in Midtown Anchorage, which is worth millions of dollars more than it was purchased for at a non-judicial sale. That is, it was bought for $4.1 million and they've admitted it's worth at least $4.75 and actually it's worth millions more. That sale was violated. First of all, the notice requirements of AS 34-20070, in terms of what has to be in the notice of the default, and then the sale requirements and the Alaska Supreme Court decision in McHugh v. Church and now Chief Justice Fabe and Superior Court Judge Fabe's decision in the Stanton case. The heart of this case is in the excerpts of Record of Volume 4, 1022-1073. That's the exchange of correspondence which shows clearly that at every step, the lender frustrated and imposed conditions for curing the sale that were not allowed under the statute. The other crucial side is the 276 of Volume 1. That's the notice of default of sale. The other crucial evidence is, first of all, set out in our opening brief, pages 13-16. This is a testimony of Leslie Pickett of the land title of trustee, which shows that she in no way contemplated her discharge, her duties as an independent trustee as to the sale in terms of considering the continuance. And it's just absolutely clear there. I took that deposition and set it out in our brief. She tried to come in later then in the case and submit a contrary affidavit, but that's a disputed material fact. There's also significant testimony in this record from Mr. Gilmore, who is the attorney trained to wear two hats, representing the trustee and the beneficiary, and Mr. Stump. I want to, first of all, briefly refer your honors, and I know you've read it, but to the actual statute in question, which is a privilege. It has to be strict compliance, because if you go to the courthouse and take someone's property, you're basically impinging the basic right to due process, consultation, cross-examination, trial by jury, all of our basic constitutional rights. That has very strict requirements, and they've been interpreted to the last of the Supreme Court. First of all, you can only do the sale, quote, if the trustee has complied with the notice requirements of B of this section. Second of all, that notice requirement says the notice has to state the nature of the breach. And then third, it says, at any time before the sale, if the default has arisen by failure to make payments required with the trustee, the default may be cured by payment of the sum in default, other than the principal, which they may do if no default had occurred, plus attorney's fees, et cetera. The notice of default and sale, which I've given you in the reference. Excuse me. Under Alaska law, does that avoid, then, an acceleration clause, which in this case happened where they accelerated the full payment? I think it does. I'm not absolutely sure on that, Your Honor, but I believe it does. Well, okay. I don't know if it's material here, but meeting you mentioned it, I was just curious. Okay, thank you. And my straightforward answer is I believe it does. I don't have a direct citation for you, and it's really not necessary in this case. I was going to say, if it's not material, fine. It's not essential. Okay, thank you. Right. They did give notice. In the notice of default, they said that the default was a $5 million default. They basically had accelerated it. Yes. But the statute says you can cure by paying. And basically, the Alaska statute is a three strikes rule statute. That is, you can cure once, you can cure twice, the third time you can't cure, so you've got to pay it all. Well, maybe the better question in my mind, because now I'm kind of lost, was there any attempt to cure, and is that an issue in the case? There was an attempt to cure, and here's what happened. The crucial letter is that it reappears throughout the record, but it's at Excerpt 1054. And what happened is this. They kept raising the bar. Every time, essentially, Mr. Cusack, who owns Bongo, tried to cure, they kept saying, no, you've got to do this, no, you've got to do that. Did that have to do with the repair covenants or the maintenance covenants in the deed of trust? Did you ask if that had to do with it? I'm sorry, I didn't hear you. Raising the bar, did that have to do with the repair and maintenance covenants? It certainly did. And there's three paragraphs of the deed of trust that claim there was no default. If I can back up just for a moment, what happened in this case, and it's in the record, is that Mr. Cusack got in an argument with the fire department, and they shut him down for a while. And I represented him and got him started again. And as a result of that, it accentuated his financial problems. He went to Chapter 11. The lender saw a chance to come in and grab a very valuable piece of property, and they did. That's not unusual. I know. You're talking about regular commerce, and I guess where I'm trying to sort this out is that I'm trying to find out whether, because Alaska, like other states, says within the terms of the deed of trust, if you do the right thing, you can foreclose. And I'm trying to find out what went wrong with foreclosure. I hear you say something about the demands relative to the maintenance and repair provisions and a frustration. But can a deed of trust, what did the deed of trust holder do beyond the scope of the deed of trust and the Alaska law that makes this sale not valid? Here's the direct answer. If it's a monetary default, you go nonjudicial. You publish your notice. You give them a sum. They either show up in clear or they don't, and you sell the property. Right. But if you're going to then, after the notice is registered, start throwing in additional conditions on nonmonetary defaults, you can't go nonjudicial. And I kind of read that. That's where I'm going. Let's assume, just to be simplistic, that there's a monetary default and it's never cured. Right. As that's going on and a proper notice is given, which would trigger a nonjudicial sale, the lender also says, because he didn't want to correct it, you go correct all those deficiencies in the windows and the floors. That doesn't affect the sale, or does it? Well, it shouldn't. And that's precisely our point. Well, how under Alaska law would that affect the sale? Because he's still in default, and that's good enough to get the trustee sale, isn't it? But here's the answer. At 156 of the excerpt, this is what they said, January 31, 2003, a letter from Mr. Jennifer Coleman, who is the partner of the counsels arguing today. Finally, as GMAC has advised Bongo on several occasions, GMAC will not cancel its foreclosure proceedings and reinstate the deed of trust if Bongo solely cures the monetary defaults which exist under the deed of trust. The defaults which exist under Sections 3.8, 3.9, and 3.10 of the deed of trust must also be cured in order for GMAC to terminate foreclosure proceedings. Well, let's assume that's the case, and let's assume they try to have a sale after there's a financial cure. You're going to have to start a new notice. I mean, they can threaten anything. I'm just wondering what happened with this sale because it was still a monetary default, and as I understood, it was a sale because of the monetary default. Even though they're asking for compliance with other provisions of deed of trust, which is also business customary, that doesn't mean they can foreclose on those. The question is, was the monetary default proper? Was it ever paid, and was it proper to foreclose under that? Unless you're claiming some sort of harassment or something that I don't understand. Well, basically it's an unclean hands issue here, but to answer your three questions you just asked me, was the monetary default proper? There was some monetary default at issue. Was the sale proper? No, because they linked the two together. Mr. Arkley was perfect. Well, they may link them together, but that's what I'm wondering under Alaska law. If they link them together, does it destroy the first notice that's based upon the monetary default, which is never cured prior to foreclosure sale? And my answer is yes, because you can't tell it. Here's the question, Your Honor. Well, if it's yes, then what's the Alaska law on that? The statute. Because it says right here under the statute that you can cure if you show up and pay the money, and they said in their letters they're not going to let them cure if they show up and pay the money unless they cure the other. So they put extra statutory conditions on a cure, and not only as to Mr. Kusak, but they did as to his lender who was standing by ready to refinance, and they told Mr. Arkley that first of all they wanted $300,000 extra on a cure fund, and they told Mr. Arkley that unless these vague conditions were cured, they wouldn't cancel the sale. So you have a lender, and that brings us into the trustee duty to consider the reason for a postponement, and a request was made, I think it was about a two-week request to postpone the sale so $1.75 million could be advanced, which would have totally cured the monetary defaults. But come up with a $300,000 fund, and they kept saying, no, we won't postpone the sale. Can I ask you one question? Sure. So I'll make sure that I'm on the same page with you. In the record, and it's a little vague in my mind now, what is the specificity of the notice of default, and what is the default that's listed in the notice of default that triggers a sale? It's at page 276, volume 1, Your Honor. Okay, and what is it? This is what it says. And the statute says they have to say the nature of the breach. They list the nature of the breach being a failure to pay the principal balance of $5 million, etc., etc., and they say there's certain amounts due, plus default entrance and fees and fees. It's a whole side issue, or it's a central issue, but I don't want to get into that. But that's the notice. They never gave any notice. All right, let me stop you right there. Sure. I understand what you're saying. Let's assume you came in, and you actually had cash in hand, and you dumped it on the table, and they refused to take it. Did that happen? Close is the answer, and here's the answer. Mr. Arkley wrote him a letter and said, I'll basically, if you'll postpone that sale for roughly two weeks. No, that's different. Postpone is different. I mean, you know, show me the money is the key here, because under these strict, nonjudicial sales are tough, I agree, but if you're noticed that you have to pay the deficiency and it's been accelerated, if you say I want a continuance, maybe Alaska law gives you that. I'm not sure. It does. Because if you had paid it and they accepted it, then under Alaska law, wouldn't they have to re-notice the default test of the deficiencies on maintenance and repair in order to have another sale? Yes, they would, but let me answer your owner's question, please. Alaska law may be different. I know it's Alaska law. The Stanton opinion, which is at page 1067 of the record, which is now Chief Justice Faye, then she was the Superior Court, and it basically refers to the McHugh v. Church case, which is former Chief Justice Rabinowitz's opinion in 1978, says, if I do share a duty for the trustee to consider continuing the sale to allow the financing to be in place. So your owner's comment about show me the money, you don't have to have it on the table. You have to have reasonable chances of getting it. If you could give me just a second. No, I didn't mean to interrupt you. I really appreciate this exchange, Your Honor, but this is what Justice Faye said they had to do in the Stanton case. In that case, they had simply written and asked for, quote, more time on the foreclosure sale to muster what resources he can to either effect a cure or locate a buyer that will secure for him at least a portion of the equity he perceives exists in the property. And on the basis of that vague request, the law was that the trustee had to consider its fiduciary duty to possibly give him that time. Now, Plickett, or Ms. Plickett in this case, basically took her marching orders from Mr. Gilmore and didn't even know there was a request for continuance and didn't consider it. And Mr. Archley wrote him a letter like a few days before and basically said, you give me two weeks, I'll start the title commitment, I'll come up with $1.75 million. What they basically said was, that may be fine, your $1.75 million, but we still don't like these non-monetary defaults. And so he was concerned that if he paid his $1.75 million, then they still would jerk the property out from under him on some kind of vague monetary default. And I'd like to please make this point. If you allow the blending of the two, which is in this record, and they basically said you can't cure unless you cure the non-monetary defaults, what does someone do at the courthouse? Normally you show up at a sale and you say, stop the sale, I'm paying the rearage. But was Mr. Cusack supposed to go to the courthouse and say, here's my $1.75, here's my proof of this non-monetary default, here's my proof of this, what's the crier of the sale to do? That's why you can't link the two, and that's what they did here, and they made it impossible to cure. You didn't try to bring any action to file a lease pendants or stop the sale. Well, there has been a lease pendants filed. There was no injunction. They didn't seek injunction, no, they did not. But they did file a lease pendants. There's a lease pendants in effect. I can't really recall whether it was before or after the sale, Your Honor. I can't give you the date on it. What I'm talking about, you're talking about the courthouse. If you had started an action prior to the foreclosure sale and filed a lease pendants, you might have resolved any disputes you had under the terms of deed of trust. But I didn't see anything in the record that anything legally was preventing the foreclosure sale. I'm not certain on that. Well, it may not be important, but you brought it up in the courthouse. I'm just about down to my 50 minutes I was going to use for this, but I want to note this tonight. The so-called non-monetary defaults, as established in Mr. Stump's definition, which is in this record, even under the deed of trust, they couldn't require that those so-called non-monetary defaults be cured within two weeks or a month. Some of them, they had to give at least 120 days. And they even asked for a business plan, which was submitted, which would have cured the so-called non-monetary defaults, and that wasn't good enough. But the bottom line is they used a non-judicial mechanism and linked issues that had to be resolved. And the real bottom line is here, this case needs to be tried in the district court so we can show to the fact finder why they did impede the financing and why the trustee didn't exercise this duty and why the sale is not only void but voidable. Thank you. Okay. And you've saved just a little over four minutes. Right. Good morning. May it please the Court. My name is Joseph Demko. I represent State Street Bank and Trust Company as trustee and GMAC Commercial Mortgage. I will refer to them for the sake of brevity as the lender. Mr. Timmermans represents Land Title, and we've agreed that I'll take 15 minutes. Mr. Timmermans will take five. We'll try to help you, but you also try to keep track. I will. Thank you. Mr. Timmermans is going to address the issue of fiduciary duty with the trustee. I'll address as best I can the other issues as were raised. I think it's important to keep in mind in this case the factual history because Bongo starts with the point in time where the lawsuit was filed in district court, but there's a lot of history that precedes that. As the Court's aware, and I won't try to repeat everything in the record, the first time Bongo went into default was the spring of 2001. A reinstatement agreement was entered into between GMAC and Bongo, and then Bongo went into default again in December of 2001 by failing to make the approximately $65,000 per month payment. The loan was accelerated in May 20th, I believe, 2002, and on May 21st, 2002, Bongo filed a Chapter 11 bankruptcy petition in the bankruptcy court here in Alaska. Now, that's significant because a lot happened in the bankruptcy. What happened in the bankruptcy is GMAC moved for relief from the automatic stay, and there were three hearings, I believe, held in the bankruptcy court from August of 2002 through September of 2002. The basis of the relief from stay motion was twofold. Number one, Bongo had defaulted on its obligations. The loan had been accelerated, and the obligation was owed from December of 2001 forward. In other words, no payments had been made during that time. Number two, the property remained vacant, was closed, needed rehabilitation work, and the harsh Alaskan winter was coming, and somebody had to do something to make sure that the property was protected. Ultimately, the bankruptcy court on September 17th, 2002, entered an order granting relief from the automatic stay. Now, in the context of the motion for relief from the automatic stay, a declaration was filed that set forth in great detail both the monetary and the non-monetary defaults that existed under the deed of trust, the note, and the secured loan documents. The order of the bankruptcy court, which provided relief from the stay, set forth what Bongo claimed was owed, what GMAC claimed was owed, in the context of trying to determine whether there was any equity in the property so that a reorganization would be possible. Ultimately, the bankruptcy court came to the conclusion that there was a very, very little equity cushion, and therefore granted relief from the automatic stay. Based on that relief from the automatic stay, this lawsuit was filed, and in this lawsuit, again, the first thing that was filed was a motion for the appointment of a receiver, which again contained in great detail the monetary defaults, the non-monetary defaults, what the defaults were, what was owed. Was your concern that prior to a foreclosure sale that the property would deteriorate and the value would be dissipated? Yes, Your Honor. It was a concern of GMAC, particularly given the fact we're moving into the winter. There has to be heat kept on. Otherwise, all the pipes will burst. There are all sorts of terrible things. You're trying to preserve your security value. That's correct, Your Honor, and that's why we moved to the appointment of a receiver. And that was pending our going to non-judicial foreclosure since Bongo, at that point in time, was still in Chapter 11 bankruptcy, which ultimately got converted to a Chapter 7 bankruptcy. But you've got the lift stay, so you still could file your notice and go forward with a non-judicial stay. As of September 17, 2002. That's correct, Your Honor. So in the district court action, we filed the motion for relief from the automatic stay with all that detailed information. On October 16, 2002, we filed a notice of default and served the notice of default, which Mr. Widener spoke of. Nothing happens in the case for the rest of October. Nothing happens in November. Nothing happens in December. But then January 7, 2003, two weeks before the sale is set, we get a letter that says, tell us how much we owe to CURE. And because we couldn't give them that information immediately, we continued the sale until February 4, 2003, and later provided them with the information. Then there's an exchange of letters that go back and forth, back and forth as to is the CURE amount correct, I don't agree with this number, I don't agree that you can force me to cure non-monetary defaults, et cetera, et cetera. And we then get to the point where the sale is set for February 6. According to the deposition testimony of Mr. Cusack, the day before he called the trustee and said that he was going to ask for a continuance the next day. And if it wasn't granted, there may be some legal problems. According to the deposition testimony of everyone else, the morning of the sale, Mr. Cusack contacts Pat Gilmore, GMAC's local counsel, and says, will you consent to continue the sale? Will the lender? And the response is no. And the reason the response was no is because we had asked for proof that Bongo had the money to CURE. And what we got was the Arkley letter, which said we are considering a loan to Bongo. Not that we have a commitment to a loan to Bongo. At this time, was the receiver, had the receiver been appointed? Was that lawsuit still open? Yes, Your Honor. Did Bongo ever attempt to, did they file a lisbennas or attempt to stop the sale because with the lisbennas, you couldn't have gone forward? No, Your Honor. Did they file a counterclaim? Anything with regards to the provisions of the deed of trust? No, Your Honor. The only lisbennas that was filed was subsequent to the foreclosure. And that was after the sale. And there was one in a state court action, and there was one filed in this action. But there was no action taken by Bongo in any way to prevent the sale from going forward. And then when we look at what occurred at the sale, what we have, and I believe the videotape was offered as evidence, and Your Honors have reviewed it, there wasn't an offer to cure. What there was was an offer, if you postpone the sale until this afternoon, I'll show up with a check for $10,000, and then you have to continue the sale for a number of other days, and then I'll show up with $4,090,000, which equals the amount that you're going to credit bid. So in essence, Bongo was offering to purchase a note, which it owed over $5 million on, for $4.1 million. So that's the factual situation we find ourselves in. The issue is whether or not that creates the unusual circumstances that are necessary under Alaska law. And I respectfully disagree with Bongo's assertion of what Alaska law is. Alaska law does not say you have to continue a foreclosure sale to allow the borrower to go get money. As a matter of fact, there's a case, I believe it's the Semlek, S-E-M-L-E-K case, where that very issue is addressed. Somebody sought to set aside a foreclosure sale because he was applying for a loan from his credit union. And the credit union even said, we probably would have given the loan. And the Supreme Court of Alaska said, that is not a tender. You get to stop sales by tendering an amount sufficient to cure the deficiency. At the time that you received this proposal to continue, had they gone to Chapter 7 by that time? My recollection is it was converted by that time. So they're in Chapter 7, they're properties under receivership that you had appointed, and they asked for time to go get some money. That is correct, Your Honor, which you can understand is kind of implausible that somebody is going to lend into a Chapter 7 bankruptcy an amount sufficient to cure the default. Well, and with the continuing receivership, somehow you're going to have to deal with that in receivership, too. That's also correct, Your Honor. That's also correct. Before I eat up too much time, I'd just like to address a couple of things that Mr. Widener mentioned. He references the Stanton decision. That's a state trial court decision that has no precedential value. But even if it did, what that decision says is that the trustee must exercise their discretion in some fashion. The trial court said the trustee did not think they had the authority to exercise the trustee's discretion. And therefore, the court rejoined the sale. That's another distinction in Stanton. Stanton is a case where somebody actually came in to enjoin the sale before it went forward, not set aside the sale after it had occurred. The second thing Mr. Widener mentioned that I think that we need to deal with is that there's case law in Alaska to the effect that you have to give somebody additional time to find financing. I would respectfully submit that if you read the cases that we've all cited, and I think we all agree on what the body of case law is, there's nothing in those cases to suggest that. As a matter of fact, Semlink suggests otherwise. Mr. Widener also said that it's a matter of record that Mr. Cusack had some problems with the fire department and they closed them down, et cetera. This was the reason for the financial problems. I'm unaware of anywhere in the record where that is established. The only thing I'm aware of in the record is that everybody agrees the default occurred in December of 2001 and the $65,000 was owed per month as of that date. Where the parties also disagree in their briefs is what is the standard for Alaska courts to apply in deciding to set aside a foreclosure sale. Our position is that the law says there has to be an inadequacy of the price and some injustice or unfairness to the prejudice of the borrower. Let me briefly deal with the statement that there's an inadequacy in the sale price. The evidence to which Mr. Widener refers about the $4.75 million value is not correct. What that was, that was the testimony of Jerry Stumpf, a GMAC employee, who said that's what the property would be listed for. He said he thought the property was worth, at the time of foreclosure, around $4.1 million. But even if we assume, for the sake of argument, that the value of the property was $4.7, over $5 million was owed. So GMAC could have bid a credit bid of $5 million, could have gone up to, I think, about $5.5 million was owed at the time of sale. So the fact that it chose to bid $4.1 million versus the $5 million that was owed doesn't mean there was an inadequacy. May I just for a sec clarify, at the time of the foreclosure sale, the receiver complained that the case is still going on, and then you'd ask for declaratory relief that the foreclosure sale was in accordance with the law. I guess you had a cloud on title at that time, so you had to remove it. That's correct. What happened, Your Honor, is immediately after the sale, Mr. Cusack went and he just recorded a list of pendants that made absolutely no reference to any case or anything going on. So at that point in time, there was a cloud on the title. Well, the lawsuit itself is a cloud on the title, too. To a certain extent, yes. Well, try to get title insurance with that on there. Well, we've been trying, Your Honor, trust me. With little success, it might happen. Yeah, I imagine. In any event, the law is clear that there isn't this balancing test that says there just has to be a minimal amount of harm. There has to be very, very strong circumstances, even when there's failure to comply with the Alaska statute. I would also disagree with Mr. Widener's interpretation of the Alaska statute, 3420.070, about monetary versus non-monetary defaults. What it says is that any time before the sale, if the default has arisen by failure to make payments required by the trustee, the default may be cured by the payment of the sum in default. That implies that you can go to non-judicial foreclosure sale if there are non-monetary defaults. In other words, there's nothing in Alaska law that says if there are non-monetary defaults, you have to go to judicial foreclosure. You just didn't notice those in the first notice. The non-monetary defaults were not in the first notice, but I think it's irrelevant because the monetary defaults upon which the first notice was based were never cured. Is there an equity reduction in Alaska? I do not know the answer to that question. I don't think there is if you go to non-judicial foreclosure. I was wondering because his argument is that you underbid and that you, in effect, took the property for less than its value. What's the Alaska law on that issue? Well, I believe the Alaska law... If it is an issue in this case, I'm not sure. I don't think it is for the reasons I articulated earlier as to the value of the property and the evidence. I'm going to cut into Mr. Timmerman's time just to answer Your Honor's question. No, that's all right. I'll be happy to do so. But to answer Your Honor's question, mere inadequacy of price is not sufficient to set aside a foreclosure. Thank you. Mr. Timmerman. Thank you. May it please the Court, I'm Todd Timmerman. I represent land title in this action. Just on that last question for Your Honor, with a non-judicial foreclosure, there is no right to redeem the property. For judicial foreclosures, there are. The exchange you get with a non-judicial foreclosure is you can't bring suit on the note for any deficiency. That's the law in Alaska on that issue. I'd like to speak a little bit about the role of the trustee in a non-judicial foreclosure. It seems like Bongo has confused the role of a trustee to an expressed trust with the role of a trustee under a deed of trust. They're extremely different. And courts agree that there are none of the fiduciary duties. A trustee under a deed of trust doesn't have those fiduciary duties that you have an expressed trust. The only real duties a trustee under a deed of trust has is to see the sales conducted in the event of default, the property is paid off, then reconvey the deed of trust. Those are its duties, and we submit that the trustee complied with all duties it was required to in this case. Bongo seems to say that there are two things the trustee did wrong in this case that should prevent the sale being set aside. The first is that Mr. Gilmore, the attorney for the beneficiary, was the person who actually cried the foreclosure sale, and they say that under the statute you can't do that. We would say that that's against the express wording of the statute. The relevant statute, AS3420.080B, says the attorney for the trustee may conduct the sale and act as auctioneer. It says may. The district court in this case said that language was not mandatory, it was permissive, and that there was nothing inherently wrong with the attorney for the beneficiary conducting the sale. It's further shown by that same statute later down in subsection E. That section recognizes that the trustee is not the only one that can conduct the sale. That portion of the statute says the trustee may postpone the sale by delivering to the person conducting the sale a request for postponement. That statute recognizes it's usually not the trustee itself that's conducting the sale. They appoint someone. In the state of Alaska, it's usually the attorney for the beneficiary that is the person that does the job of crying the sale. That's fairly customary with title companies. It's customary in Alaska, at least for the last 20 years I know of in Alaska. Ms. Plickett in her affidavit said she's been involved in 8,000 deed of trust foreclosures, and that's customary. It's your sale, so you designate it, unless precluded by statute. The agent is to conduct your sale. Yes, exactly. We don't see that as an issue, and there's nothing inherently wrong with the trustee doing that. Even assuming the statute is violated in some way, how has Bongo been harmed by that? There's no harm. The second issue is the postponement of the sale. They say that a postponement was required under the statute. That's just not true. The statute grants the trustee the discretion to postpone the sale when the trustee feels a postponement is needed. The statute specifically says the trustee may postpone the sale. It doesn't say anymore. It doesn't say when or what circumstances the trustee may postpone the sale. Finally, they say that Land Title didn't have enough information. They didn't have enough information to make an informed decision whether to postpone the sale. What Land Title did know was that the trustor was in default. The trustor had been in and out of bankruptcy. The trustor was, at the time of sale, about 14 months behind in making payments. The bankruptcy court had granted relief from stay. The foreclosure sale had already been postponed on two occasions. The beneficiary didn't want another postponement, and that there was no cure amount that was given, and that the trustor had never requested the trustee to postpone the sale. So under those circumstances, we think the trustee exercised their discretion. They just don't like the way the discretion was exercised. Thank you. Okay, thank you. Mr. Widener, I think you've saved some time. I did. McHugh v. Church, 583p2-210. The trustee under the Alaska Supreme Court, Chief Justice Rabinowitz, the trustee under a deed of trust generally is regarded as owing a fiduciary duty to both the trustor and the beneficiary and is required to perform his duties impartially. He goes on to say, One manifestation of this dual fiduciary duty is the requirement that the trustee take reasonable and appropriate steps to avoid sacrifice of the debtor's property and his interests. That's the square hole in the Stanton case that Justice Faye referred to. She said specifically there is a fiduciary duty. I'm not saying the law is you have to grant a continuance. The law is the trustee has to consider it. This is what Leslie Pickett said. It's on page 14 of my brief. It's cited in the record. As the trustee under the deed, did you ever consider any reasons why the sale should be postponed? No, and why not? I didn't feel it was necessary. And I don't have time to read the whole exchange, but Mr. Gilmore basically said there will be no continuance. This is the situation, Your Honor, on your question about show me the money. Mr. Barclay on February 3 wrote this letter. They're considering a loan of $1.75 million. He said Security National Trust requests GMIC to postpone the foreclosure sale to February 20th. So they're asking for two weeks. So the loan under consideration can be funded and an agreement for disbursement of the reserve account be completed. So they're coming up with full cure on their rearages plus the $300,000, which they didn't even have a right to, except for the man. He says, upon your confirmation, the foreclosure sale will be postponed to February 20th, 2003. I will call my attorney in Anchorage and direct him to order a preliminary commitment for title insurance and begin preparation for the necessary documents to complete the loan to Bongo II. They then wrote back and said, no, we won't continue it. And by the way, they said, you can't have a second deed on the property. Now, the deed of trust says you can't have a second deed without permission of the first, but that can't be commercially unreasonably withheld. So they frustrated the financing to cure. Were you still in Chapter 7 at that time? I'm not sure. I don't know. I could probably file a supplemental letter and tell you the date on that. No, I'm just curious. Right. But Mr. Arkley is a man that basically had the capacity to wire the money overnight, assuming they would agree to the conditions. So this whole issue about the money not being there, it wasn't there because they kept raising the bar. And if you read his deposition, he was concerned about he's putting up the 1.75 and then them saying, hey, there's another non-monetary default here. Your question about underbidding, first of all, they say, well, we could have bid 5.75 or whatever. They didn't. They probably did it for tax purposes. Who knows? But the fact is they bought the property for 4.1 million. They've admitted they were going to try and sell it at least for 4.75, and the truth is there's evidence this record is worth millions more. But the law is this, to answer your question, there's no right of equitable redemption on a properly conducted non-judicial foreclosure. But the case law says you set them aside if there's basically a forfeiture or a substantial equity loss when there's an irregularity. And it especially says, and that's the Rosenberg case, and I cited it in my brief, you set them aside when there's no bona fide purchaser for value. So this is not a situation where somebody showed up at the courthouse and said, I've got 4.1 million, I'm buying the property. This is the lender, and the law in Alaska is you do set them aside. This whole issue about the balancing test, again, I just addressed that, but if there's a substantial loss of equity and irregularities, the bottom line here, again, is that you have to consider a continuous. The trustee has to. Nobody considered it here. The trustee was taking these marching orders from the beneficiary. Finally, on the receiver issue, that's a different issue. As a matter of fact, whether they were in or out of receivership, the receiver had a duty to preserve the property. But that doesn't mean you can go ahead and pull it away and stop the financing. The last thing I want to say, and maybe I'm not out of time. You are out of time, but let's hear your last thing. The last thing I want to say is this. They frustrated Mr. Arkley's willingness to cure. The fact that we didn't come to federal court and say, here's the money to cure and to the judge below, because they had taken the property. And then you can't refinance it. But you can't do a nonjudicial foreclosure in these circumstances and totally ignore McHugh and the independent duty. And even though they've done this for 20 years, the day after the sale, Mr. Grochow wrote him a letter and said, Stanton says you can't do it. I just lost a case, you can't do it. When there's these kind of issues, you have to have independent consideration. And the reason is somebody's got to protect the equity. Thank you for your patience. Thank you very much. Thank both sides for their helpful argument in this case. State Street Bank and Trust, this is Bongo 2, submitted for decision.
judges: Goodwin, Brunetti, W. Fletcher